IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JEFFREY HECK, | ) | CASE NO. 1:20CV2133 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER BOYKO |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Jeffrey T. Heck ("Plaintiff" or "Mr. Heck") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying his

application for Disability Insurance Benefits ("DIB").  (ECF Doc. 1.)  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate

Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of

the Commissioner be AFFIRMED.

## I.  Procedural History

On October 4, 2018, Plaintiff filed an application for DIB.  (Tr. 188.)  He alleged a

disability onset date of April 22, 2016.  (*Id*.)  He alleged disability due to arthritis, joint pain,

hand pain, and sleep apnea.  (*Id*.)  Plaintiff's application was denied at the initial level (Tr. 193)

and upon reconsideration (Tr. 212), and he requested a hearing (Tr. 230-31).  On February 4,

2020, a hearing was held before an Administrative Law Judge ("ALJ").  (Tr. 151-86.)

1

On February 19, 2020, the ALJ issued a decision finding that Mr. Heck had not been under a disability within the meaning of the Social Security Act from April 22, 2016 through the date of the decision.  (Tr. 19.)  On September 8, 2020, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6.)

On September 22, 2020, Plaintiff filed a Complaint challenging the Commissioner's final decision.  (ECF Doc. 1.)  The parties have completed briefing in the case.  (ECF Docs. 14, 16.)

## II. Evidence

### A.    Personal, Educational, and Vocational Evidence

Plaintiff was born in 1962, and was 57 years old on the date of his hearing.  (Tr. 155.)  He had at least a high school education.  (Tr. 329.)  Plaintiff had not worked since April 22, 2016, the alleged onset date.  (Tr. 13.)

### B.    Relevant Medical Evidence

The discussion below is limited to Mr. Heck's physical impairments, as he does not challenge any findings relating to his mental impairments.  *See Stiltner v. Comm'r of Soc. Sec.*, 244 F. App'x 685, 686 (6th Cir. 2007) ("[Plaintiff] waived any argument…by not including it in his brief."). The discussion below is also limited to medical records dated prior to the relevant ALJ decision.  While Mr. Heck also discusses medical records dated after the ALJ decision, such evidence is relevant only to the sentence six remand argument addressed in Section VI.C., *supra*, and will accordingly be discussed in that section alone.

#### 1.    Treatment History

On March 22, 2017, Mr. Heck was seen by Dr. John Michael Surso for his annual wellness visit.  (Tr. 388.)  He reported fatigue and nocturia.  (*Id.*)  His blood pressure was 193/107, and he weighed 298 pounds, with a body mass index (BMI) of 44.01 (Tr. 390.)  On

physical examination, all other findings were noted to be in the normal range.  (Tr. 390-91.)  Mr. Heck was prescribed Lopressor for hypertension.  (Tr. 391-392.)

At his next annual wellness visit on March 27, 2018, Mr. Heck complained of shortness of breath and chest pain with palpations.  (Tr. 405, 407.)  On physical examination, he weighed 294 pounds with a BMI of 43.80, but all other findings remained normal.  (Tr. 407-08.)  His assessment was benign essential hypertension, obstructive sleep apnea, hypercholestremia, other chest pain, dyspnea on exertion, and palpitations.  (Tr. 408.)

Mr. Heck returned to Dr. Surso on September 26, 2018 for treatment of toe pain on the left side of his foot.  (Tr. 413.)  He reported lack of sleep, anxiety, aching all over, carpal tunnel pain in his hand, and inability to find a job.  (*Id*.)  On physical examination, his blood pressure was 152/87, he weighed 299 pounds with a BMI of 44.15, and was noted to be tender to the left proximal fifth metatarsal.  (Tr. 415.)  He was diagnosed with obstructive sleep apnea, gastroesophageal reflux disease, low testosterone, hypercholestremia, and left foot pain.  (*Id*.)  An x-ray of Mr. Heck's left foot was ordered.  (*Id*.)  The x-ray was taken the next day, and revealed no acute process and mild degenerative changes.  (Tr. 469-70).

Mr. Heck returned to Dr. Surso on November 1, 2018 for treatment of a non-painful bump in his right forearm, which he worried was connected to discomfort in the median nerve distribution of his right hand.  (Tr. 654.)  On examination, his blood pressure was 165/81, he weighed 300 pounds with BMI of 44.30, and he was noted to have a 2.5 cm lump on the dorsum of the right arm.  (Tr. 656.)  He was diagnosed with a lipoma of the right upper extremity and referred to orthopedics.  (Tr. 657.)

On November 18, 2018, Mr. Heck was treated by orthopedic surgeon Dr. Scott Weiner for right elbow lipoma and right-hand pain.  (Tr. 488.)  He reported a painless lump had appeared

on his forearm one month ago, and that he sometimes experienced burning and tingling shooting down his right arm into the back of his thumb.  (*Id*.)  He also reported excessive thirst and depression.  (Tr. 490-91.)  On examination, Dr. Winer noted a 1 x 1 cm mass in the subcutaneous tissue on Mr. Heck's right forearm.  (Tr. 491-92.)  He ordered an MRI of the mass.  (Tr. 492.)

On January 29, 2019, Mr. Heck saw sports medicine specialist Dr. Robert Crawford for his left knee pain.  (Tr. 481.)  He reported the pain started a week prior, and that his knee "popped" and gave out on the stairs the day before.  (*Id*.)  He said the pain was improving, but complained of symptoms that were burning, pressure-like, stabbing, constant and nagging, and worse with activity, stair climbing, weight bearing, sitting for prolonged periods of time, and walking.  (*Id*.)  Over-the-counter analgesics were effective treatment.  (Tr. 482.)  He reported no chest pain or shortness of breath.  (Tr. 484.)  His blood pressure was 158/92 and he weighed 300 pounds.  (*Id*.)  Examination of the left knee revealed effusion, mild swelling, and tenderness in the medial joint line, decreased range of motion, pain with manipulation of the lateral gastroc tendon proximal portion, pain with activation of the gastric muscle, and positive bounce home and McMurray tests.  (Tr. 484-86.)  An x-ray of the left knee revealed patellofemoral joint space that was significantly narrowed laterally with lateral osteophytes, with lateralization, but no fracture and no sign of joint effusion.  (Tr. 486.)  Radiologist Jeffrey Weil also noted moderate degenerative changes to the left knee, with milder degenerative changes to the right.  (Tr. 497-98.)  Mr. Heck was diagnosed with acute pain of the left knee, tear of the medial meniscus of the left knee unspecified tear type, post-traumatic osteoarthritis of left knee, and gastrocnemius strain.  (Tr. 486)  Conservative management was recommended, including a home exercise program and avoiding deep squats and pivoting.  (Tr. 486-487.)  Mr. Heck was instructed to return for an alternate course of therapy if conservative treatments were not effective.  (Tr. 487.)

On February 12, 2019, Mr. Heck returned to Dr. Weiner for a follow up appointment regarding his right elbow lipoma and right-hand pain.  (Tr. 476.)  He reported no pain in his arm, but occasional numbness and tingling primarily in his right fingers and pain in his right hand joints that was worse in the morning and improved with activity.  (*Id*.)  An MRI on January 30, 2019 revealed a lipoma, and Dr. Weiner indicated the reported symptoms appeared to be mild carpel tunnel syndrome unrelated to the lipoma, and recommended NSAIDs.  (Tr. 480, 494.)

At a March 12, 2019 office visit with Dr. Surso, Mr. Heck requested routine lab work. (Tr. 661.)  His blood pressure was 162/83 and he weighed 297 pounds, but other examination findings remained normal.  (Tr. 664-665.)  He was assessed with vitamin D deficiency, generalized anxiety disorder, essential hypertension benign, hypercholestremia, and gastroesophageal reflux disease without esophagitis.  (Tr. 664.)

Dr. Charles Muncrief reviewed x-rays of Mr. Heck's right ankle and lumbar spine on March 25, 2019 in connection with a consultative examination.  (Tr. 520-21.)  He noted the right ankle x-ray was a limited study, and showed degenerative changes without acute abnormality. (*Id*.)  The x-ray of Mr. Heck's lumbar spine revealed moderate degenerative changes.  (Tr. 520).

On June 18, 2019, Mr. Heck was seen by Dr. Aisha Rahman for pain management, after being referred by Dr. Surso.  (Tr. 573.)  Mr. Heck complained of knee, lower back, left foot, and right ankle pain, stating his pain had gotten worse over the past 42 years, and described it as dull, aching, shooting, stabbing, sharp, and worse in the morning and evening.  (Tr. 574.)  He reported the pain increased with bending forward, changes in weather, climbing stairs, coughing/sneezing, lifting objects, rising from a seated position, sitting, standing, and walking.  (*Id*.)  He also reported numbness, tingling, weakness in the arm/leg, and joint swelling/stiffness.  (*Id*.)  On examination, his blood pressure was 169/96, he weighed 299 pounds with a BMI of 44.15, and

he exhibited tenderness of the left knee.  (Tr. 576-77.)  He was assessed with chronic pain syndrome, facet arthropathy, arthritis of both knees, history of right knee surgery, and ankle arthritis.  (Tr. 577.)  Dr. Rahman prescribed Relafen and ordered a left knee steroid injection (Tr. 577), which was performed on June 24, 2019 (Tr. 586).

Mr. Heck sought a second opinion from podiatrist Dr. Matthew Bianco on August 19, 2019 regarding pain on the top of his left foot which was sometimes achy and sometimes sharp, and nerve pain in his left toes.  (Tr. 594.)  A previous podiatrist had prescribed orthotics, which Mr. Heck did not like.  (*Id*.)  Mr. Heck weighed 285 pounds.  (Tr. 595.)  On examination, findings were in the normal range except for ankle equinus with less than 20 degrees, with dorsiflexion noted bilaterally at the ankle joint.  (*Id*.)  Dr. Bianco diagnosed an acquired equinus deformity of both the left and right foot left foot pain, and bone spur of the left foot.  (Tr. 595-96.)  He recommended that Mr. Heck continue to wear his orthotics and wide toe box shoes, not sandals.  (Tr. 596.)  He gave Mr. Heck an injection in his left foot.  (Tr. 596.)

Mr. Heck did not show up to his scheduled follow up appointment on September 17, 2019, but returned to Dr. Bianco on November 15, 2019.  (Tr. 597.)  He reported that the injection had relieved his pain for over a month, and was minimal when it recently returned. (*Id*.)  Dr. Bianco's examination again noted ankle equinus with less than 20 degrees, with dorsiflexion noted bilaterally at the ankle joint.  (Tr. 598.)  Dr. Bianco advised Mr. Heck to wear his orthotics and wide toe box shoes and call for an injection if his pain flared up.   (Tr. 599.)

On September 28, 2019, Mr. Heck returned to Dr. Surso for treatment of a mass on his right forearm, and low back pain radiating to the bilateral flank area.  (Tr. 688.)  He also reported occasional transitory palpitations.  (Tr. 689.)  Dr. Surso noted that the mass on his arm was a lipoma, and the back pain was being treated with physical therapy.  (Tr. 689.)  Mr. Heck weighed

298 pounds, and Dr. Surso discussed the need for weight loss and increased exercise.  (Tr. 689,

691.)  Mr. Heck was assessed with a mass of the right upper extremity, bilateral flank pain,

palpations, and class III severe obesity.  (Tr. 692.)

### 2.  Opinion Evidence

#### i.  Consultative Examinations

On March 25, 2019, Dr. Mark Vogelgesang performed a consultative medical

examination of Mr. Heck at the request of the state agency.  (Tr. 521-25.)  Mr. Heck reported

low back pain and stiffness, right ankle pain, left knee pain, some tingling in his fingers and

hands, and weakness and pain in his right hand.  (Tr. 521.)  Dr. Vogelgesang reviewed treatment

notes from September 2018, and referenced Mr. Heck's disability interview, indicating he

reviewed those records as well.  (*Id*.)  Dr. Vogelgesang noted Mr. Heck was diagnosed with

osteoarthritis at L5-S1 about five years ago, and with a torn meniscus in his knee in 2019.  (*Id*.)

Mr. Heck reported he had back and knee pain if he sat more than ninety minutes, stood more

than an hour, or walked more than about a half mile, and had a hard time sleeping because of

occasional pain and the need to urinate at night.  (Tr. 522.)  He reported he could drive a car and

carry and lift thirty pounds.  (*Id*.)  He denied any heart or lung problems, but reported he was

occasionally short of breath, had high blood pressure, low vitamin D, low testosterone, and

obstructive sleep apnea.  (Tr. 523.)

On examination, Mr. Heck had high blood pressure and weighed 295 pounds.  (*Id*.)  Dr.

Vogelgesang also noted Mr. Heck showed slight stiffness getting out of the exam chair and onto

the exam table, slight tenderness on palpation of the lower back, right knee tenderness on the

medial aspect, and slightly unsteady heel to toe walking.  (Tr. 523-24.)  Other examination

results were in the normal range, including good range of motion and full strength in all joints.

(*Id*.)  Dr. Vogelgesang's impression was morbid obesity, hypertension, low back pain, bilaterally knee pain, and obstructive sleep apnea.  (Tr. 524.)

Dr. Vogelgesang explained that Mr. Heck's "morbid obesity appears to be one of his biggest problems along with his high blood pressure."  (*Id*.)  He stated that the right ankle and left knee were probably affected by Mr. Heck's weight, and that he had some arthritis.  (*Id*.)  He opined that Mr. Heck could perform light to sedentary work and may not be able to do extensive bending or twisting because of his weight and low back, must avoid doing a lot of stairs because of his ankles and knees, and might need to rest periodically because he was in poor shape.  (*Id*.)

For the reasons discussed in II.B., *infra*, the psychiatric consultative examination that took place on March 27, 2019 is not discussed herein.  (*See* Tr. 531-37.)

### ii. Opinion of Plaintiff's Treating Physical Therapist

Physical therapist Matt Trnka, PT/ DPT provided a statement on behalf of Mr. Heck dated September 4, 2019, which was based upon physical therapy to treat Mr. Heck's neck and low back pain between March 21 and July 16, 2019, with handwritten therapy records attached. (Tr. 606-614.)  Mr. Trnka opined that Mr. Heck had functional deficits with prolonged standing and lifting more than twenty pounds for work and home tasks.  (Tr. 606.)  He reported that Mr. Heck's problems included pain when standing more than twenty minutes, pain with material handling more than twenty pounds, and restrictions with his ability to use safe body mechanics. (Tr. 606.)   Attached records reflect that Mr. Heck withdrew from treatment in July 2019, but engaged in further therapy between September 6 and December 6, 2019.  (Tr. 615- 618.)

### iii.      State Agency Reviewers

On December 29, 2018, state agency reviewing physician Dr. Dimitri Teague reviewed the record and opined that Plaintiff had no severe physical impairments, and therefore had not proven a need for any residual functional capacity analysis.  (Tr. 189-90.)

On April 3, 2019, state agency reviewing physician Dr. Kalpna Desai reviewed the expanded record, which now included Dr. Vogelgesang's consultative examination, and opined that Plaintiff had the following physical functional limitations:

- occasionally lift and/or carry 20 pounds;

- frequently lift and/or carry 10 pounds;

- stand, walk and/or sit (with normal breaks) about 6 hours in an 8-hour workday;

- frequently climb ramps/stairs;

- occasionally stoop, kneel, crouch, and crawl;

- never climb ladders/ropes/scaffolds;

- avoid all exposure to hazards such as heavy machinery, and unprotected heights.

(Tr. 205-07.)

For the reasons discussed in II.B., *infra*, the findings of the state agency psychiatric reviewers are not discussed herein.

## C.      Hearing Testimony

### 1.      Plaintiff's Testimony

At the February 4, 2020 hearing, Mr. Heck testified that he lived alone in a house, although his girlfriend often stayed the night, and was supporting himself with what was left of a settlement he received after being fired from his last job, and help from his mom.  (Tr. 157.)

On a typical day, he would get up around 5:30 a.m. to have coffee with his girlfriend before she left for work.  (Tr. 171.)  Then his day was empty, and he tried to find something to do.  (*Id*.)  The day before the hearing, he began working with a trainer at a new gym near his house to improve his fitness.  (*Id*.)  Then he went to the grocery store, put the groceries away, made lunch, washed the dishes, and did chores like dusting and laundry.  (Tr. 172-73.)  He checked email on his computer, emailed his doctor to make an appointment, put everything away, turned on the tv, and relaxed until his girlfriend came home.  (Tr. 173.)  He made them dinner, because he did almost all of the cooking.  (*Id*.)  Then they hung out, watched tv, and fell asleep early.  (Tr. 174.)  In general, he tried to keep busy and keep moving if he could, as best he could.  (*Id*.)  He needed help with cleaning the house because of his back, so he had a maid come once a month.  (Tr. 174-75.)  He went to church, restaurants, and movies, but sat in the back row so he would not disturb anyone if he needed to get up and move around.  (Tr. 175.)

He could stand about a half an hour to an hour before he needed to move around.  (Tr. 176.)  Then he had to sit or take the weight off his feet, ankle and knee for ten or fifteen minutes.  (*Id*.)  He found it hard to bend over, and really hard to pick things up off the floor.  (Tr. 177.)  He could not crawl or do a full squat because of damage to his right leg from the motorcycle accident.  (*Id*.)  His fingers got stiff if he wrote or used the computer too long.  (Tr. 178.)

His last job was an inside sales position for a wholesale electrical HVAC and plumbing supply company.  He worked in the plumbing side of the business, and would sit at a desk, answer the phone, take orders, and answer customer questions.  (Tr. 159.)  Sometimes he would make calls to look for new business, but that wasn't required.  (*Id*.)  Prior to that, he worked for the same company as a counter sales clerk, which required him to stand, or sit on a stool, behind a counter and take orders from customers who walked in.  (Tr. 159-60.)  He rarely had any lifting

in either job. (Tr. 160-61.) He left that job on April 22, 2016. (Tr. 161.) He was fired because he couldn't sit any longer, and would get up and walk around every ten or fifteen minutes, and his supervisors got angry with him about it. (Tr. 162.) When he stopped working, he weighed forty or fifty pounds less than he did at the time of the hearing. (Tr. 179.)

He was unable to work because of pain in his knees, ankle, and the small of his back. (Tr. 164.) He could not sit or stand very long. (*Id.*) He went to physical therapy to treat the pain, but his access was limited by Medicaid. (Tr. 165.) Physical therapy helped him feel better. (Tr. 167.) He had an injection in his knee the prior summer, which helped for about three months. (Tr. 166.) He was unwilling to take prescription pain medication because he had a family history of addiction, and lost his sister to drug addiction. (*Id.*) He took as little over-the-counter pain medication as possible because he did not want to screw up his gut. (Tr. 167.) He had pain ever since a childhood motorcycle accident, but it had gotten worse as he aged. (*Id.*)

He also had a bone spur on his left foot that started really hurting if he was on his feet too long. (Tr. 168.) He wore orthotics to treat that. (*Id.*) His podiatrist wanted to make new orthotics, but Medicare would not pay for them to be replaced yet. (Tr. 169.)

He had a driver's license and could drive for an hour to an hour-and-a-half, but then he needed to get out and walk because his knees, ankles, and back got stiff. (Tr. 158.) His attorney drove him to the hearing. (*Id.*)

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing, and classified Plaintiff's past work as that of an inside sales job, performed at the sedentary level, and counter sales, performed at the light level. (Tr. 180-81.)

For his first hypothetical, the ALJ asked the VE to assume an individual of Plaintiff's age and education and with his past work, limited to light work with the following functional limitations:

- Frequent ramps and stairs;

- No ladders, ropes, or scaffolds;

- Occasional stoop, kneel, crouch, and crawl; and

- No unprotected heights, moving mechanical parts, or operating a motor vehicle.

(Tr. 181.)  The VE testified that the hypothetical individual would be able to perform Plaintiff's past work.  (*Id*.)  The VE further testified that the hypothetical individual could perform representative positions in the national economy, including housekeeping cleaner, folder, and inspector.  (Tr. 181-82.)

The ALJ then amended the hypothetical to add the limitation to a sedentary level of exertion.  (Tr. 182.)  The VE testified that the hypothetical individual could do the inside sales job as Mr. Heck actually performed it, but not as generally performed, because that required a light level of exertion.  (*Id*.)

The VE also testified that there were no skills from Mr. Heck's prior jobs that would transfer to a sedentary level of exertion with little or no vocational adjustment.  (Tr. 182.)  He explained that a worker who is off-task more than ten percent of the workday or absent more than one day a month would not be able to maintain competitive employments.  (*Id*.)

### III. Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520;[1]  *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his February 19, 2020 decision, the ALJ made the following findings:[2]

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2022.

2.   The claimant has not engaged in substantial gainful activity since April 22, 2016, the alleged onset date.

3.   The claimant has the following severe impairments: obesity, essential hypertension, degenerative disc disease of the lumbar spine, osteoarthritis, obstructive sleep apnea.

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.   The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except with the following additional limitations. The claimant can frequently climb ramps and stairs, but cannot climb ladders, ropes, or scaffolds. The claimant can occasionally stoop, kneel, crouch, and crawl. The claimant cannot work at unprotected heights, near moving mechanical parts, and cannot operate a motor vehicle as part of a job.

---

[1] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq*., corresponding to the last two digits of the DIB cite (*i.e.*, 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

[2] The ALJ's findings are summarized.

6. The claimant is capable of performing past relevant work as a hardware/counter salesperson (DOT 279.357-050). This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity.

(Tr. 13-18.)

Based on the foregoing, the ALJ determined that Mr. Heck had not been under a disability, as defined in the Social Security Act, from April 22, 2016, through the date of the decision on February 19, 2020.  (Tr. 19.)

### V. Plaintiff's Arguments

Mr. Heck raises two assignments of error:

I. The Administrative Law Judge erred in failing to properly evaluate the Plaintiff's obesity pursuant to Social Security Ruling 19-2p.  (ECF Doc. 14, p. 14.)

II. Medical records submitted subsequent to the hearing are new and material evidence warranting remand.  (*Id*. at p. 16.)

### VI. Law & Analysis

**A.   Standard of Review**

A reviewing court must affirm the Commissioner's conclusions unless it determines that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989.  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Where, as here, the Appeals Council denies review, the

decision of the ALJ becomes the final decision of the Commissioner. *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010); *citing Osburn v. Apfel,* 182 F.3d 918 (table), 1999 WL 503528, at *4 (6th Cir. 1999). In these cases, the Sixth Circuit has made clear that "we may only review evidence that was available to the ALJ to determine whether substantial evidence supported her decision." *Id*.

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). To assess whether substantial evidence supports the ALJ's decision, a court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

**B.      First Assignment of Error: Whether ALJ Erred in Evaluating Mr. Heck's Obesity**

Mr. Heck asserts that the ALJ erred by evaluating the effect of his obesity on his residual functional capacity under SSR 02-1p rather than SSR 19-2p. (ECF Doc. 14, pp. 13-14.) Because of this error, he argues the ALJ "did not consider the obesity in combination with Mr. Heck's orthopedic problems," and failed to consider the combined effect of his obesity and arthritis on his joint function. (*Id*. at pp. 14-16.)

The ALJ discussed the impact of Mr. Heck's obesity in two distinct sections of the decision. First, in explaining his determination that Mr. Heck does not meet or medically equal any impairment(s) on the listing of impairments, the ALJ stated:

> In reaching the determination that the claimant's impairments do not rise to listing level, I also considered the effect his obesity has on his other impairments and his

16

> ability to perform routine movement and necessary physical activity within the
> work environment.  I also considered how his obesity may cause fatigue that would
> affect his ability to function physically pursuant to <u>Social Security Ruling 02-1p</u>.
> Because the physical examinations contained in the record were mostly
> unremarkable, I find that the claimant's obesity either singularly, or in combination
> with his other medically determinable severe impairments, does not result in
> limitations greater than those assessed in this opinion.

(Tr. 15 (emphasis added).)  Second, in discussing the residual functional RFC limitations he

found supported by the medical evidence, the ALJ further explained:

> I note the claimant presents as morbidly obese, being five feet nine inches tall,
> weighing approximately three hundred pounds (*e.g.,* 1F20). I have considered how
> this high body weight might cause and or exacerbate the claimant's reported lower
> back and joint pain. That said however, as the majority of the physical status
> examinations in this record show the claimant to have retained full strength in all
> of his joints, I find any limits caused by obesity are no [sic] acute in nature (*e.g.,*
> 10F6). Accordingly and considering the limitations of obesity, I find the claimant
> can frequently climb ramps and stairs, but cannot climb ladders, ropes, or scaffolds.
> Due to issues relating to body habitus, I find the claimant can occasionally stoop,
> kneel, crouch, and crawl.

(Tr. 17.)  Thus, the ALJ made detailed findings regarding the impact of Mr. Heck's obesity on

the listings analysis and RFC limitations, but appears at least on the face of the decision to have

relied on the standard in SSR 02-1p in analyzing Mr. Heck's obesity.

It is undisputed that SSR 02-1p was rescinded effective May 20, 2019, and replaced with

SSR 19-2p.  The text of the new regulation states: "We will apply this notice on May 20, 2019."

Soc. Sec. Ruling, 19-2p, 2019 WL 2374244 (S.S.A. May 20, 2019).  However, it is unclear

whether the effective date for SSR 19-2p applies only to <u>applications</u> filed after May 20, 2019, or

to all <u>decisions</u> rendered after that date.  In this case, Mr. Heck filed his application for benefits

on October 4, 2018 (Tr. 188) and the ALJ denied his application on February 13, 2020 (Tr. 19).

If the effective date applies to new applications only, the applicable SSR here is SSR 02-1p.  In

contrast, if the effective date applies to all subsequent decisions, the applicable SSR is 19-2p.

Some courts have interpreted the above language to mean that "the Social Security Administration stated that SSR 19-2p applies only to applications filed on or after May 20, 2019." *Holt v. Saul*, No. 4:19-CV-01894, 2020 WL 2549346, at *3 n. 2 (S.D. Tex. May 19, 2020) (quoting *Ramirez v. Comm'r of Soc. Sec.,* No. 5:18-CV-2140, 2019 WL 5802512, at *13 n.8 (N.D. Ohio June 19, 2019)). Other courts have applied SSR 19-2p to cases where the decision was issued after May 20, 2019, even though the applications were filed prior. *See, e.g., Pittman v. Saul*, No. 220CV02014, 2020 WL 7974491, at *2 (W.D. Ark. Dec. 21, 2020), *report and recommendation adopted*, No. 2:20-CV-2014, 2021 WL 41753 (W.D. Ark. Jan. 5, 2021) (applying SSR 19-2p to application filed in March 2017); *Gray v. Kijakazi*, No. 4:20-CV-00575-MDH, 2021 WL 3891585, at *6 (W.D. Mo. Aug. 31, 2021) ("SSR 02-1p does not apply to this case because it was rescinded and replaced by SSR 19-2p effective May 20, 2019, more than two months before the date of the ALJ's decision."). Other courts have noted it to be unclear whether the regulation has retroactive effect for applications filed prior to May 20, 2019. *See e.g., Smith v. Comm'r of Soc. Sec*., No. 1:20-CV-1366, 2021 WL 3566695, at n. 7 (N.D. Ohio May 28, 2021), *report and recommendation adopted*, No. 1:20 CV 01366, 2021 WL 2800549 (N.D. Ohio July 6, 2021) ("Because [plaintiff's] claim was filed before May 20, 2019, the ALJ might have technically erred by applying SSR 19-2p – unless SSR 19-2p was retroactive.").

Ultimately, it need not be determined here whether SSR 19-2p's effective date hinges on the date the application was filed or the date the decision was issued. As other courts have observed, SSR 02-1p and SSR 19-2p are largely consistent in their discussion of how obesity should be analyzed, so that the application of either regulation would lead to the same result. *Compare* SSR 02-1p, 2002 WL 34686281, with SSR 19-2p, 2019 WL 2374244; *see also Smith,* 2021 WL 3566695, at n. 7 (SSR 02-1p and SSR 19-2p are "generally the same" in evaluating

obesity); *Vickers v. Saul*, No. 4:19-CV-00179-HBB, 2020 WL 6434850, at *4 (W.D. Ky. Nov. 2, 2020) ("Upon review of SSR 02-1p and SSR 19-2p, the consideration for whether obesity is factored into the 'meets' and 'equals' determination is largely identical"); *McTague v. Saul*, No. 1:18-CV-02967-RM, 2020 WL 4499994, at *4 n.4 (D. Colo. Aug. 5, 2020) (finding the result of applying SSR 19-1p instead of SSR 02-1p would be the same).

Mr. Heck asserts that the ALJ failed to properly analyze his obesity under SSR 19-2p in this case because the ALJ: failed to analyze the impact of obesity on Mr. Heck's ability to perform exertional movements in light of limitations in his range of motion; and "failed to inquire further" into how obesity impacted Mr. Heck's joint function. (ECF Doc. 14, pp. 15-16.) In support of this argument, he cites to related language in 19-2p (Tr. 14-15):

> A person may have limitations in any of the exertional functions, which are sitting, standing, walking, lifting, carrying, pushing, and pulling. A person may have limitations in the nonexertional functions of climbing, balancing, stooping, kneeling, crouching, and crawling. Obesity increases stress on weight-bearing joints and may contribute to limitation of the range of motion of the skeletal spine and extremities. Obesity may also affect a person's ability to manipulate objects, if there is adipose (fatty) tissue in the hands and fingers, or the ability to tolerate extreme heat, humidity, or hazards.
>
> <u>We assess the RFC to show the effect obesity has upon the person's ability to perform routine movement and necessary physical activity within the work environment</u>. People with an MDI of obesity may have limitations in the ability to sustain a function over time. In cases involving obesity, fatigue may affect the person's physical and mental ability to sustain work activity. This may be particularly true in cases involving obesity and sleep apnea.
>
> The combined effects of obesity with another impairment(s) may be greater than the effects of each of the impairments considered separately. <u>For example, someone who has obesity and arthritis affecting a weight-bearing joint may have more pain and functional limitations than the person would have due to the arthritis alone</u>. We consider all work-related physical and mental limitations, whether due to a person's obesity, other impairment(s), or combination of impairments.

SSR 19-2p(6), 2019 WL 2374244 (S.S.A. May 20, 2019) (emphasis added)).

While the above language does recommend consideration of the "ability to perform routine movement and necessary physical activity within the work environment" and the potential impact on a person "who has obesity and arthritis affecting a weight-bearing joint," *id.*, Mr. Heck offers no explanation as to how this new language differs from prior recommendations under SSR 2-1p.  Indeed, a reading of SSR 02-1p(8) suggests there is no material difference:

> Obesity can cause limitation of function. The functions likely to be limited depend on many factors, including where the excess weight is carried. An individual may have limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling. It may also affect ability to do postural functions, such as climbing, balance, stooping, and crouching. The ability to manipulate may be affected by the presence of adipose (fatty) tissue in the hands and fingers. The ability to tolerate extreme heat, humidity, or hazards may also be affected.
>
> The effects of obesity may not be obvious. For example, some people with obesity also have sleep apnea. This can lead to drowsiness and lack of mental clarity during the day. Obesity may also affect an individual's social functioning.
>
> <u>An assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment</u>. Individuals with obesity may have problems with the ability to sustain a function over time. …
>
> The combined effects of obesity with other impairments may be greater than might be expected without obesity. <u>For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone.</u>

SSR 02-1P, 2002 WL 34686281 (S.S.A. Sept. 12, 2002) (emphasis added).

Because there is no material difference between the recommendations in SSR 2-1p and SSR 19-2p regarding the assessment of obesity's impact on Mr. Heck's ability to perform routine movements or the added impact of obesity on his joint impairments, it makes no difference whether the ALJ properly cited to SSR 2-1p in assessing the impact of Mr. Heck's obesity, or should have cited instead to SSR 19-2p.  Where applying either SSR would achieve the same result, the ALJ's apparent reliance on SSR 2-1p instead of SSR 19-2p is at most harmless error,

and provides no basis for remand.  *See, e.g., Luukkonen v. Comm'r of Soc. Sec.*, 653 F. App'x

393, 399 (6th Cir. 2016) (finding an argument that an ALJ "failed to properly apply SSR 12–2p's

guidelines" to be unavailing when "although the ALJ did not explicitly cite SSR 12–2p, it

nevertheless applied the Ruling's principles"); *see also Rabbers v. Comm'r Soc. Sec. Admin*., 582

F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th

Cir. 2007))  (finding decision will not be upheld where SSA fails to follow its own regulations if

the error "prejudices a claimant on the merits or deprives the claimant of a substantial right").

It is evident that the ALJ's analysis of the impact of Mr. Heck's obesity was consistent

with the parallel recommendations of both SSR 2-1p and SSR 19-2p.  He explicitly "considered

the effect [Mr. Heck's] obesity has on his other impairments and his ability to perform routine

movement and necessary physical activity within the work environment," noting that "the

physical examinations contained in the record were mostly unremarkable."  (Tr. 15.)  He also

"considered how this high body weight might cause and or exacerbate [Mr. Heck]'s reported

lower back and joint pain," noting that "the majority of the physical status examinations in this

record show [Mr. Heck] to have retained full strength in all of his joints."  (Tr. 17.)  These

findings were consistent with the ALJ's prior discussion of the back and joint impairments,

where he cited to imagery identifying moderate degenerative changes in the spine and some

joints, with the knees noted to be "particularly bothersome," but ultimately held:

> [T]he degree of shown impairment to the knees … is much lesser than the pain
> levels the claimant has reported.  A great majority of the physical status
> examinations in this record have shown the claimant retains full muscle strength in
> both knees despite these findings of some moderate degenerative changes in both
> joints (e.g., 5F5, 10F6).  The claimant's allegations of acute difficulties with
> prolonged standing and walking due to knee pain are inconsistent with these signs
> of retained strength in both knee joints (5F5, 10F6).  That the claimant is presently
> working with a physical trainer and engaged in weight training more strenuous than
> the effort required to simply stand and walk also reveals inconsistency in his
> subjective allegations (hearing testimony).  I also note that x-rays of the knees and

21

ankles have failed to show a degree of osteoarthritic change to support the claimant's reported inability to stand and walk for long periods (1F83).

(Tr. 16.)  Based on these findings, the ALJ concluded that Mr. Heck's obesity would support the addition of climbing and postural limitations to the RFC.  (Tr. 17.)  The ALJ's discussion of Mr. Heck's obesity thus appropriately addressed the considerations identified in the language of SSR 19-2p quoted by Mr. Heck.  (ECF Doc. 14, pp. 14-15.)

Mr. Heck's argument that the evidence supports more significant restrictions is not well taken.  (ECF Doc. 14, pp. 15-16.)  First, much of this evidence – including Mr. Heck's reports of subjective symptoms, x-rays documenting moderate degenerative changes to his knees, and his weight of "approximately three hundred pounds" – was explicitly noted and considered in the ALJ's decision.  (Tr. 16-17 (citing hearing testimony, 6E, 1F, 2F, 5F, 10F).)  Second, it is well-settled that even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ."  *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. Aug 7, 2020); quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

There is no basis here to conclude that the ALJ failed to assess the combined effect of Mr. Heck's obesity and his other severe impairments as required by SSR 02-1p or SSR 19-2p. Although Mr. Heck disagrees with the ALJ's conclusions, they are supported by substantial evidence and therefore entitled to deference from this Court.

**C.**     **Second Assignment of Error: Request for Sentence Six Remand**

Mr. Heck asserts that medical records that he submitted subsequent to the hearing were new and material, not available at the time of the hearing, and might have led the ALJ to reach a

different conclusion.  (ECF Doc. 14, p. 16.)  Therefore, he argues that the case should be remanded for consideration of this late-submitted evidence.  (*Id*.)

The Sixth Circuit explains that "where the Appeals Council considers new evidence but declines to review a claimant's application for disability insurance benefits on the merits, the district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision," and can only consider it as the basis for a sentence six remand. *Cline v. Comm'r of Soc. Sec*., 96 F.3d 146, 148 (6th Cir. 1996).  There are two kinds of remand under Section 405(g): a "sentence four remand" made in connection with a judgment affirming, modifying, or reversing the commissioner's decision; and a "sentence six remand" where the court makes no substantive ruling as to the correctness of the Commissioner's decision.  *See Melkonyan v. Sullivan*, 501 U.S. 89, 97–101, 111 S.Ct. 2157, 2163–64, 115 L.Ed.2d 78 (1991); *see also Hollon v. Comm'r od Soc. Sec.*, 447 F.3d 477, 486 (6th Cir. 2006).  This Court is not permitted to consider evidence that was not submitted to the ALJ in the sentence four context, but may consider such evidence to determine whether a sentence six remand is appropriate.  *See Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007); *Foster*, 279 F.3d at 357.

The records cited by Mr. Heck were submitted after the ALJ's decision on February 13, 2020, and can therefore be considered only in the context of a sentence six remand.  To justify remand under sentence six, Mr. Heck must demonstrate that the evidence he now presents in support of a remand is new and material, and that there was "good cause" for his failure to present this evidence in the prior proceedings.  *See Hollon*, 447 F.3d at 483; *see also Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276-278 (6th Cir. 2010) (finding claimant failed to meet burden of showing good cause for failure to submit evidence and that evidence was material).  Evidence is new "only if it was not in existence or available to the claimant at the time of the

administrative proceeding." *Ferguson*, 628 F.3d at 276 (internal quotations and citations omitted).  Evidence is material "only if there is a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Id*.  (internal quotations and citations omitted).  "A claimant shows good cause by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ."  *Id*.  (internal quotations and citations omitted).

Here, a review of the additional records submitted by Mr. Heck demonstrates that the above standard has not been met.  The records that Mr. Heck submitted include:

- records of MRIs which were taken on June 18, 2020 (Tr. 74-75, 76-77);

- medical records of right shoulder treatment, including evaluation of an x-ray image of the shoulder, by orthopedist Dr. Sziraky dated June 17, 2020 and July 17, 2020 (Tr. 86-98, 99-104);

- a medical source statement and medical records from his primary care provider Dr. Surso dated April 29, 2020 and May 12, 2020 (Tr. 42-63, 120-24, 143-49);

- results of blood testing ordered by Dr. Surso in anticipation of Mr. Heck's annual wellness visit, dated May 1, 2020 (Tr. 129-142); and

- medical records and a medical source statement from podiatrist Dr. Limpersos dated June 29, 2020 and July 14, 2020 (Tr. 68-72, 105-06).

All of this evidence is clearly "new," as it post-dates both the hearing and the ALJ's decision. *See, e.g.*, *Franson v. Comm'r of Soc. Sec.*, 556 F. Supp. 2d 716, 725 (W.D. Mich. 2008) (finding doctor's post-hearing statement "is 'new' because it was generated after the ALJ decision").

However, Mr. Heck has failed to establish that medical records, which were not created until months after the ALJ decision in question, are "material" under a sentence six analysis. The records are made up entirely of medical examinations, findings, and opinions that post-date the ALJ's decision, with no explicit information suggesting that they relate back to the time-period at issue.  For example, Dr. Limperos' medical source statement was dated July 14, 2020,

and did not indicate that it documented Mr. Heck's capacity during the relevant period.  (Tr. 105-06.)  Dr. Limperos had last examined Mr. Heck on June 29, 2020 (Tr. 68-72), which supports an inference that he based his opinion on that post-hearing examination.  Similarly, Dr. Surso's May 12, 2020 medical source statement does not state or imply that the opinions therein relate back to Mr. Heck's condition prior to the ALJ decision.  (Tr. 120-21.)

Mr. Heck argues that the new evidence should be considered material even though it was created after the ALJ's decision because it related to "longstanding problems" that were identified as severe impairments in the ALJ's decision.  (ECF Doc. 14, p. 19.)  However, it is observed that even longstanding conditions change over time.  Indeed, Mr. Heck testified in this case that his condition has progressively worsened over time.  (Tr. 167.)  This assertion is supported by his medical records from the relevant period, in which he reported to his doctor that his knee, back, foot, and ankle pain "began 42 years ago with various injuries and has gradually gotten worse."  (Tr. 574.)

Further, it is noted that many of the relevant records – including Dr. Sziraky's notes (Tr. 86-88), Dr. Limperos' medical source statement (Tr. 105-06), and Dr. Surso's notes (Tr. 42-43) and medical source statement (Tr. 120-21) – in addition to being based on examinations occurring after the relevant period, also discuss Mr. Heck's physical condition in the present tense, suggesting that they "reference the doctor's opinion of the claimants then current level of functioning."  *Gearing v. Comm'r of Soc. Sec.*, 417 F. Supp. 3d 928, 946 (N.D. Ohio 2019).

Because the findings and opinions at issue do not clearly speak to Mr. Heck's condition at the relevant time, and in fact appear to directly reference his medical condition a number of months after the ALJ decision was issued in the case, the undersigned finds that they are not material.  *See Ferguson*, 628 F.3d at 277–78 (finding evidence subsequent to the date of the

ALJ's decision is "properly deemed 'immaterial' because it does not necessarily speak to [plaintiff's] condition at the relevant time") (citing *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 478 (6th Cir. 2003) (finding evidence regarding claimant's condition was more severe after the relevant time is immaterial because it "could suggest that [plaintiff's] condition has deteriorated")); *Cranfield v. Comm'r, Soc. Sec.*, 79 F. App'x 852, 859 (6th Cir. 2003) (finding doctor's report to be immaterial when it "discussed [plaintiff]'s condition as it existed ten weeks after the ALJ made his decision"); *see also Wyatt v. Sec. of Health & Human Servs*., 974 F.2d 680, 685 (6th Cir. 1992) ("Evidence of a subsequent deterioration or change in condition after the administrative hearing is deemed immaterial").

Additionally, it is clear that Mr. Heck has failed to establish good cause for his failure to obtain and produce the records prior to the ALJ decision.  "A claimant shows 'good cause' by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Hollon*, 447 F.3d at 485.  Here, Mr. Heck offered no explanation or justification for his failure to seek the relevant examinations, imagery, and/or opinions prior to the hearing, and has thus failed to meet his burden to show good cause.  *See Franson*, 556 F. Supp. 2d at 726 (finding no "good cause" for failure to submit medical records generated post-hearing when moving party failed to explain why the evidence was not obtained earlier and submitted to the ALJ before the ALJ's decision); *see also Brace v. Comm'r of Soc. Sec*., 97 F. App'x 589, 592 (6th Cir. 2004) (finding decision to "arrange the tests just prior to [plaintiff's] ALJ hearing does not establish good cause to warrant a remand"); *Cranfield*, 79 F. App'x at 859 (finding no good cause for failure to submit post-ALJ-decision doctor reports when plaintiff "had months to prepare for the hearing" and "could have sought the reports earlier" or "contacted the doctors or visited their offices if the reports were important to her case").

26

Mr. Heck's failure to seek to hold the record open for post-hearing evidence (Tr. 153-54, 185) provides an additional basis to conclude that the request for sentence six remand is not supported by good cause.  *See Bass*, 499 F.3d at 514 ("[P]laintiff's counsel did not seek to have the record remain open to submit the evidence here provided, which in and of itself shows a lack of good cause."); *Cranfield*, 79 F. App'x at 859 (finding no good cause when plaintiff chose not to notify the ALJ that additional evidence was forthcoming, and "must live with the consequences").

For all of the reasons stated above, the undersigned concludes that a sentence six remand is not supported by the record or arguments offered in this case.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the Commissioner be AFFIRMED.

December 28, 2021

/s/Amanda M. Knapp

_____

AMANDA M. KNAPP
United States Magistrate Judge

## <u>OBJECTIONS</u>

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).